Filed 10/20/21  Otay Land Co. v. UE Limited CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| OTAY LAND COMPANY, LLC et al., | D076415 |
| Plaintiffs, Cross-defendants, and Respondents, | |
| v. | (Super. Ct. No. 37-2013-00043371) |
| UE LIMITED LLC, | |
| Defendant, Cross-complainant, and Appellant. | |


APPEAL from a judgment of the Superior Court of San Diego County, John S. Meyer, Judge.  Affirmed.

Law Office of Barbara S. Farley, Barbara S. Farley; Law Offices of Charles J. Wisch and Charles J. Wisch for Defendant, Cross-complainant and Appellant.

Mintz Levin Cohn Ferris Glovsky & Popeo, Antony D. Nash and Nada I. Shamonki for Plaintiff, Cross-defendant, and Respondent Otay Land Company.

Mara W. Elliott, City Attorney, George Schaefer, Assistant City Attorney, and Benjamin P. Syz, Deputy City Attorney, for Cross-defendant and Respondent City of San Diego.

After Otay Land Company, LLC (Otay Land) purchased a large parcel of vacant land it intended to develop into a "village," it discovered an issue with its title to a narrow strip within the parcel. After conducting research into the title to the property, Otay Land eventually learned that the strip, which the parties refer to as the "Pipeline Strip," was separately conveyed over a century earlier for the construction of a now nonfunctioning water pipeline. Tracing a series of transfers over the ensuing decades, Otay Land eventually determined that it did not have legal title to the Pipeline Strip, which was instead partially owned by both appellant, UE Limited LLC (UE Limited), and the City of San Diego (City).

In response, Otay Land filed this quiet title action, contending that it acquired title to UE Limited's portion of the Pipeline Strip through adverse possession. Before trial, the City sold a portion of the Pipeline Strip to Otay Land. UE Limited filed a cross-complaint, alleging that contrary to Otay Land's claims, the City never had an ownership interest in the Pipeline Strip and that Otay Land was trespassing on its land.

At a bench trial, the trial court found in Otay Land's favor by concluding that the City did have an ownership interest in the strip, which was partially transferred to Otay Land, and that Otay Land met its burden to establish its adverse possession claim as to the portion of the Pipeline Strip owned by UE Limited.

UE Limited appeals the resulting judgment. It raises a variety of challenges on appeal, asserting the trial court erred in admitting and excluding evidence; the court failed to correctly interpret the deeds forming

2

the chain of title for the Pipeline Strip; the court erroneously concluded that certain laws did not preclude Otay Land's claims; and the evidence supporting Otay Land's adverse possession claim was insufficient. We conclude that UE Limited has failed to demonstrate any prejudicial error by the trial court. Accordingly, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In 1998, Otay Land purchased 4,735 acres of land in a probate sale from the estate of Mary Marshall Rand Birch Patrick. Within these acres was a lot referred to as Lot 27, the focus of this action.

Otay Land purchased the land with the intent to pursue entitlement and construction of a large development project. As part of that process, Otay Land worked with the City of Chula Vista to complete a plan to transform the rural, undeveloped land by obtaining the environmental review, zoning changes, and other approvals necessary to build a residential "village" including homes, schools, commercial zones, and parks.

The entitlement process was anticipated to take several years. In the interim, Otay Land took steps to secure its property. The entire property was surrounded with fences or natural barriers, and gates were added to block the roads into the land. Otay Land asked any member of the public that it encountered on the property to leave. Beginning in 2007, Otay Land also hired someone to farm the land and continued to do so until construction work began in late 2018.

In 2012 or 2013, during the entitlement process, Otay Land discovered what the parties refer to as the "Pipeline Strip," a relatively narrow strip of land running through the larger parcels that appeared to potentially involve a separate ownership interest. Otay Land's 1998 purchase of the land

3

including Lot 27 specifically excepted out the Pipeline Strip, but that fact apparently escaped Otay Land's attention at the time.

An old, metal water pipeline that was no longer in use was partially visible within the strip. Maps depicted the Pipeline Strip to be a 100-foot-wide strip of land surrounding that pipeline. After completing some research, Otay Land learned the pipeline was known as the Coronado Pipeline. A consultant retained by Otay Land originally determined that the Pipeline Strip was potentially owned by the heirs of the Spreckels family.

Otay Land filed this quiet title action in 2013 to resolve the issue and allow its development project to proceed. The complaint named as defendants the Southern California Mountain Water Company—a defunct entity—and numerous potential Spreckels family heirs. In its complaint, Otay Land alleged that in 1912, fee simple ownership of the Pipeline Strip was acquired by the Southern California Mountain Water Company. Otay Land further alleged that the City of San Diego required an easement to use and maintain the pipeline, but that the City did not acquire fee simple ownership of the Pipeline Strip. Otay Land contended that when the Southern California Mountain Water Company subsequently dissolved, ownership of the Pipeline Strip was passed to its sole shareholder, John Diedrich Spreckels. Thus, Otay Land believed that the Strip was owned by Spreckels' heirs, but asserted that it obtained ownership via adverse possession after its 1998 purchase of the surrounding parcels. Its complaint sought a quiet title determination confirming Otay Land as the owner in fee simple of the Pipeline Strip, subject to any easement rights of the City.

After filing the lawsuit, Otay Land conducted further research and concluded that the Pipeline Strip might instead be owned by the City. In late 2016, Otay Land discovered a deed from 1964 that appeared to convey title to

4

most of the Pipeline Strip to defendant UE Limited except for 25 feet of the Pipeline Strip width, plus a small 2.7-acre portion, retained by the City. In March 2017, Otay Land amended its complaint to substitute UE Limited for a Doe defendant named in its original complaint.

At the same time, HomeFed Village III Master, LLC (HomeFed), another subsidiary of Otay Land's parent corporation, filed a new quiet title complaint against UE Limited regarding several adjoining parcels of property, known as Lots 34 through 36, which were similarly encumbered by the Pipeline Strip. Pursuing the latest theory of the chain of title, HomeFed alleged the City quitclaimed the Pipeline Strip to UE Limited in 1964 and, after HomeFed's purchase of Lots 34-36 in 2011, HomeFed obtained title to portions of the Pipeline Strip via adverse possession.

In September 2017, UE Limited filed two separate cross-complaints for quiet title and injunctive and declaratory relief in both actions. The cross-complaints added the City as a cross-defendant along with Otay Land and HomeFed. UE Limited alleged that it retained ownership in the Pipeline Strip, subject to the City's easement.

Later that same month, the trial court consolidated the two actions, designating the 2013 action filed by Otay Land as the lead case. In 2018, Otay Land contended it acquired from the City a fee simple interest in the 2.7-acre parcel within the Pipeline Strip on Lot 27. In response, UE Limited filed a second amended and supplemental cross-complaint (1) asserting that the 2018 transfer of the 2.7 acres was void, (2) combining the issues raised in its original cross-complaints to seek to quiet title to the Pipeline Strip in Lots 27, 34, 35, and 36, and (3) adding a new claim regarding a similar dispute regarding ownership of the Pipeline Strip in Lot 45. Lot 45 was also owned by Otay Land, but was not part of Otay Land's original complaint.

The court subsequently granted the City's motion to bifurcate the issues involving Lot 45 and portions of Lot 36 from the issues to be determined at trial. Other than those two issues, the case proceeded to a lengthy bench trial involving the issues raised in both consolidated cases and UE Limited's cross-claims against Otay Land, HomeFed, and the City.

After hearing testimony from all parties and considering the documentary evidence, the trial court issued a statement of decision regarding Otay Land's 2013 action. The court found that in 1912, Southern California Mountain Water Company acquired a fee simple interest, not an easement, in the Pipeline Strip. The court found that after a series of transfers, the City acquired fee simple ownership of the Pipeline Strip in 1961 and then quitclaimed 75 feet of the width of the Pipeline Strip to UE Limited's predecessor in 1964. The court found that the 1964 quitclaim did not include 25 feet of the width of the strip or the separate 2.7 acres of land at the "Coronado Wye." The court further found that the City subsequently transferred the 2.7-acre parcel to Otay Land in 2018. The court concluded that although UE Limited owned the 75-foot-width of the Strip after 1964 and that the Pipeline Strip was not included in the 1998 purchase of the parcels including Lot 27, Otay Land subsequently adversely possessed the portion of the Pipeline Strip in Lot 27 owned by UE Limited. Thus, the court concluded that Otay Land had acquired title to the entirety of the Pipeline Strip at issue in this case in fee simple except for the 25-foot-wide portion retained by the City. In a separate statement of decision for HomeFed's 2017 action, the court similarly found in HomeFed's favor.

At the conclusion of the trial, the court recognized that it could enter only a partial judgment because of the consolidation of the actions and the outstanding bifurcated issues. The court noted that it could enter judgment

6

in the 2013 action "either as an interlocutory judgment or as a result of unconsolidating the cases." UE Limited submitted a memorandum contending that judgment should not be entered until the entire consolidated case, including the bifurcated issues, was heard and decided.

At a subsequent hearing, the court indicated that it intended to enter two separate judgments, one for the 2013 action immediately and a second judgment for the 2017 action following resolution of the bifurcated issues.[1] The court also stated that it would not sign any order to "de-consolidat[e]" the cases. On the same day, the court entered judgment in the 2013 action in favor of Otay Land and concluded that "UE [Limited] takes nothing by virtue of its cross-complaint." UE Limited appealed from the judgment.

DISCUSSION

A. *Scope of Appeal*

Before the parties filed their appellate briefs, and following divergent letter briefs on the issue of appealability, this court informed the parties that the appealability of the trial court's judgment would be considered on appeal. In its opening brief, UE Limited asserted, albeit only in a footnote, that the entry of judgment in this 2013 action "was premature" due to unresolved issues in the 2017 action filed by HomeFed. Despite recognizing that the appealed judgment does not resolve the 2017 action, UE Limited raised a number of issues regarding that action in its opening brief, purportedly "due to their logical connection to the issues arising from the judgment entered in the [2013] case."

In response, Otay Land argues that UE Limited forfeited the issue of appealability by failing to address the issue beyond in a footnote. Otay Land

---

1      The parties represent in their briefs that the bifurcated issues have yet to be tried.

7

also asks this court to disregard UE Limited's arguments regarding issues arising in the still-pending 2017 action.

We do not treat the appealability issue as forfeited. The question of appealability directly affects our jurisdiction such that we are "dutybound" to consider the issue even if not raised by the parties. (*Olson v. Cory* (1983) 35 Cal.3d 390, 398.)

In a multiparty action, a judgment finally disposing of all issues involving one party is final as to that party and immediately appealable. (*Justus v. Atchison* (1977) 19 Cal.3d 564, 567-568; see also *Stonewall Ins. Co. v. City of Palos Verdes Estates* (1996) 46 Cal.App.4th 1810, 1830 [recognizing "the judicially created exception to the one final judgment rule that permits appeal from a judgment in a multiparty case determining all issues between certain parties even though issues remain to be resolved between other parties"].)

Here, the judgment that is the subject of this appeal addresses all issues involving Otay Land. In its original complaint, Otay Land sought to quiet title to the entire 100-foot Pipeline Strip, which it believed it owned outright via adverse possession, within Lot 27. As the case proceeded, Otay Land modified its claim to concede that since 1964, the City owned the small 2.7-acre parcel within the Pipeline Strip plus a remaining 25-foot portion of the Strip. Otay Land then purchased the 2.7 acres from the City in 2018. The City did not dispute Otay Land's claim to title.

UE Limited, on the other hand, asserted in its operative cross-complaint and at trial that it owned the entire Pipeline Strip. It contested Otay Land's acquisition of the 2.7 acres from the City and also the acquisition, via adverse possession, of the 75-foot portion of the Pipeline Strip that was quitclaimed to UE Limited from the City in 1964. As it relates to

the City, UE Limited also contended it owned the 25-foot portion of the Pipeline Strip that the City claimed to have retained. The judgment quiets title as to both the 2.7 acres plus the 75-foot portion of the Pipeline Strip. Because these were the only portions of the Pipeline Strip where a controversy existed regarding Otay Land's ownership, the judgment resolved all issues involving Otay Land.[2] And because the judgment is final as to Otay Land, it is immediately appealable.

However, other portions of the judgment involve issues pertaining to only the City and UE Limited, including the determination that the City owns the 25-foot portion of the Pipeline Strip despite UE Limited's claim to the contrary. Because the judgment does not resolve all issues between UE Limited and the City raised in UE Limited's cross-complaint, it is not a final judgment as to the City and the issues between those parties cannot be directly addressed on appeal.[3] Likewise, this appeal does not involve the issues arising from Lots 34, 35, and 36, which are owned by HomeFed and not addressed in the judgment.

Thus, we consider the issues on appeal that relate to Otay Land and its claim to title within Lot 27, but do not directly consider the arguments regarding (1) UE Limited's challenge to the City's claim of ownership to the 25-foot-wide portion of the Pipeline Strip and in other parcels, and (2) any

[2]   There is no indication that Otay Land asserts any interest in the real property claimed by UE Limited in its cross-complaint that is to be addressed in the bifurcated trial involving separate parcels.

[3]   As we discuss *post*, the issues arising from the claims involving Otay Land indirectly affect the City's legal claims regarding its remaining interest in the Pipeline Strip even if we do not directly resolve all issues involving the City in this appeal.

issues involving Lots 34 through 36. To the extent UE Limited raises issues involving those parcels, we decline to address them in this opinion.

Thus, as framed by the trial court in its statement of decision, the trial and resulting judgment at issue in this appeal involve two central issues: (1) Otay Land's claim that it acquired fee simple ownership of 2.7 acres from the City in 2018, and (2) Otay Land's claim that it adversely possessed from UE Limited the remaining 75-foot-width of the Pipeline Strip in Lot 27. We consider each issue in turn.

B. *Otay's Ownership Interest in 2.7 Acres Obtained from the City*

The trial court found that Otay Land and the City established that the 2018 transfer of fee simple ownership in an approximately 2.7-acre[4] parcel within the Pipeline Strip was valid. To determine the validity of the 2018 transfer, the central issue at trial was the interpretation of a 1912 deed at the root of the chain of title. Whereas Otay Land and the City asserted the 1912 deed transferred a fee simple interest, UE Limited asserted it conveyed only an easement. On appeal, UE Limited challenges the trial court's finding in favor of Otay Land, contending it made erroneous evidentiary rulings and erred in interpreting the deed.

1. *Interpretation of the 1912 and 1914 Deeds*

The primary object in interpretating grant deeds " 'is to ascertain and carry out the intention of the parties. [Citations.] All the rules of interpretation must be considered and each given its proper weight, where necessary, in order to arrive at the true effect of the instrument.' " (*City of Manhattan Beach v. Superior Court* (1996) 13 Cal.4th 232, 238 (*Manhattan*

---

4      More precisely, the parcel was 2.699 acres. The parties and the trial court referred to the parcel as "2.7 acres," and we use the same approximation for purposes of simplicity with no intent to define the size of the parcel.

*Beach*); see Civ. Code, § 1066.)  A court's interpretation of a deed "requires, in the first instance, careful examination of the language in the original conveyance.  If the intent of the parties is clear, that will control." (*Manhattan Beach*, at p. 235.)  If a court finds the conveyance to be ambiguous after "canvass[ing] the four corners of the deed" the court must then turn for assistance to any relevant statutory rules governing the interpretation of deeds and, if necessary, any extrinsic evidence to the extent it informs the parties' intent and does not give the deed a meaning to which it is not susceptible.  (*Id*. at pp. 235, 242, 246.)

To ensure the court's interpretation ascertains and carries out the intention of the parties, the Legislature has directed that "we must keep in mind the following:  A grant is to be construed in the same manner as contracts in general (Civ. Code, § 1066); the deed's language determines its interpretation so long as it is clear and explicit (Civ. Code, § 1638); and a grant is to be interpreted in favor of the grantee, except that a reservation in a grant is to be interpreted in favor of the grantor (Civ. Code, § 1069)." (*County of Solano v. Handlery* (2007) 155 Cal.App.4th 566, 573 (*Handlery*).) Unless the instrument suggests that a lesser estate was intended, "[a] fee simple title is presumed to be intended to pass by a grant of real property[.]" (Civ. Code, § 1105.)

" 'It is . . . solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence. Accordingly, "[a]n appellate court is not bound by a construction of the contract based solely upon the terms of the written instrument without the aid of evidence [citations], where there is no conflict in the evidence [citations], or a determination has been made upon incompetent evidence." ' " (*Manhattan Beach*, *supra*, 13 Cal.4th at p. 238.)  However, "[w]hen extrinsic

11

evidence is properly admitted to interpret a deed, the trial court's finding must be sustained on appeal if there is any evidence, either direct or indirect, contradicted or uncontradicted, which supports that finding." (*Baker v. Ramirez* (1987) 190 Cal.App.3d 1123, 1133; *Redlands v. Nickerson* (1961) 188 Cal.App.2d 118, 127.) "On an appeal challenging the interpretation given to a writing, . . . the substantial evidence rule will apply in cases where the parties present conflicting extrinsic evidence to aid in the interpretation." (*Burch v. Premier Homes, LLC* (2011) 199 Cal.App.4th 730, 742 (*Burch*).)

Here, the parties disagreed as to the plain meaning of the language found in a 1912 deed concerning the interest conveyed in the Pipeline Strip. In that deed, the grantor, San Diego Land Company, and the grantee, the Southern California Mountain Water Company, memorialized an agreement to "pay . . . the sum of 8237 80/100 dollars for certain lands now occupied and to be occupied and used by [the Southern California Mountain Water Company] for its pipe lines, conduits and other purposes incidental and necessary to the maintenance of said pipe lines and conduits, over and across said lands mentioned in said agreement and supplemental agreement and which said lands are more particularly described in the memoranda hereto attached and made a part of this agreement and marked Exhibit 'A,' which Exhibit 'A' consists of eight pages of typewritten description and memoranda and print map or plat consisting of four sheets, showing the location on the ground of the lands to be conveyed and the location on the ground of the pipe line and conduit of the first part now laid along and over said lands; and [San Diego Land Company] in consideration of the payment of the money above specified . . . does hereby agree to convey to the [Southern California Mountain Water Company] by proper covenants hereinafter contained in this

12

instrument, all its right, title, and interest in and to said lands mentioned in said memoranda marked Exhibit 'A,' for the purposes above mentioned."

The 1912 deed also states that the San Diego Land Company "does by these presents grant to the said Southern California Mountain Water Company . . . for the purposes of being occupied and used by the said Southern California Mountain Water Company for its pipe lines and conduits and for other purposes incidental and necessary to the maintenance of such pipe lines and conduits, all its right, title and interest in and to the lands described in said Exhibit 'A.' "

In the next clause, the deed states: "To have and to hold, the above granted and described premises unto the Southern California Mountain Water Company . . . its successors and assigns forever, for the said purposes and subject to all of the conditions in paragraph three of this agreement mentioned and contained."[5]

In Exhibit A, the property being transferred includes the Pipeline Strip at issue in this lawsuit, described as "[a] body of land along the Otay-Coronado pipe line . . . with a uniform width of 100 feet, being twenty feet on the northerly side measured from the center line of said pipe line and eighty feet on the southerly side of the center of said pipe line." Exhibit A also includes a map depicting what is labeled as the "Pipe Line Right of Way."

UE Limited seizes on the use of the phrase "right of way," in Exhibit A attached to the 1912 deed, to assert that the deed granted the Southern California Mountain Water Company—and by extension its successors—only

---

[5] "Paragraph Three" requires the Southern California Mountain Water Company to (1) establish crossings "over and across the lands described in Exhibit 'A' " to permit the San Diego Land Company to move livestock, vehicles, and farm machinery across the Pipeline Strip and (2) to build a fence around the Pipeline Strip.

an easement to the Pipeline Strip and not fee title. UE Limited further contends this interpretation is bolstered by a 1914 deed in which the Southern California Mountain Water Company sold parts of its water system to the Coronado Water Company, including "all *rights-of-way*, rights and permits to place and maintain conduits and pipe lines throughout the entire length of the said Highland Reservoir Pipe Line, more particularly described as right-of-way . . . granted by the San Diego Land Company to the Southern California Mountain Water Company by [the 1912 deed]." (Italics added.)

In *Manhattan Beach*, *supra*, 13 Cal.4th 232, 240-242, the California Supreme Court held that the term "right of way" may have different meanings—possibly referring to either a fee simple interest in the land or an easement. The Supreme Court recognized extrinsic evidence may be used to determine the meaning of the term in a particular instrument. (*Id*. at pp. 245-246.) Similarly, all parties in this action introduced extrinsic evidence, including expert opinion testimony regarding custom and usage of certain terms in real estate transactions, to assist in interpreting the 1912 deed and subsequent instruments.

Although UE Limited indicated it intended to call expert witnesses at trial, it also filed a motion in limine to preclude Otay Land and the City from introducing expert testimony from two attorneys. Specifically, UE Limited sought to preclude "evidence of legal conclusions or opinions regarding the ownership of and title to the Coronado Pipeline Property." The trial court denied the motion, noting that "[t]here's no reason why a real-estate attorney can't give information regarding real-property issues. It happens all the time. They can't give a legal opinion, perhaps, but assuming there's a foundation that's properly established, they can give opinions." The court allowed the experts to testify to "share with the [c]ourt expert opinions that

14

won't tell the [c]ourt what to do, but will give the [c]ourt information about matters that the [c]ourt is, perhaps, not as aware of as someone that deals with this day in and day out." The court made clear the witnesses would not be allowed to tell the court how to resolve the case, and that it did not think counsel would be "foolish enough to ask those questions knowing that there's going to be an objection and it'll be sustained."

Otay Land's expert, Charles Hansen, testified regarding his process for performing a title search and determining the chain of title. He then testified regarding what he believed to be the correct chain of title to the Pipeline Strip, describing the general format for the instruments and terms used in each deed that he reviewed. Hansen traced the title through several documents to a quitclaim deed in 1964, in which the City retained 25 feet of the width of the Pipeline Strip, along with the 2.7 acres, and quitclaimed the remainder to UE Limited's predecessor.

Similarly, the City called its expert, David Boss, to offer his opinion regarding the chain of title. Boss opined that certain language in the 1912 deed demonstrated an intent to convey fee title.

UE Limited objects to the admission of this expert opinion testimony. UE Limited contends that the trial court abused its discretion by permitting the experts to offer "legal conclusions in the guise of expert opinions." As both parties agree, we review the trial court's determination that the expert opinion testimony was admissible for an abuse of discretion. (See, e.g., *Summers v. A.L. Gilbert Co.* (1999) 69 Cal.App.4th 1155, 1168 (*Summers*).)

Generally, a trial court may consider extrinsic evidence to assist in the interpretation of a contract or deed. "[R]ational interpretation requires at least a preliminary consideration of all credible evidence offered to prove the intention of the parties. [Citations.] Such evidence includes testimony as to

15

the 'circumstances surrounding the making of the agreement . . . including the object, nature and subject matter of the writing . . .' so that the court can 'place itself in the same situation in which the parties found themselves at the time of contracting.' [Citations.] If the court decides, after considering this evidence, that the language of a contract, in the light of all the circumstances, 'is fairly susceptible of either one of the two interpretations contended for . . .' [citations], extrinsic evidence relevant to prove either of such meanings is admissible." (*Pacific Gas & E. Co. v. G.W. Thomas Drayage etc.* (1968) 69 Cal.2d 33, 39-40, fns. omitted; see also *SLPR, L.L.C. v. San Diego Unified Port Dist.* (2020) 49 Cal.App.5th 284, 299-300.) Similarly, in *Southern Pacific Transportation Co. v. Santa Fe Pacific Pipelines, Inc.* (1999) 74 Cal.App.4th 1232, 1241-1242, the court held that a trial court interpreting an agreement should "consider *all* credible extrinsic evidence offered to show that the instrument could or could not reasonably support the proposed meaning" and "[i]f, in light of the extrinsic evidence offered, the court decided the language was 'reasonably susceptible' to the meaning urged, it should [admit] the evidence to aid in the next step of construing the ambiguous language."

Expert opinion testimony is one form of extrinsic evidence that may be considered by a court. More specifically, expert testimony is admissible to prove custom and usage in an industry, which may help " 'explain the meaning of language and to imply terms, where no contrary intent appears from the terms of the contract.' " (*Howard Entertainment, Inc. v. Kudrow* (2012) 208 Cal.App.4th 1102, 1114; see also *Varni Bros. Corp. v. Wine World, Inc.* (1995) 35 Cal.App.4th 880, 889-890.) An attorney may offer expert opinion testimony regarding questions of fact, even if that testimony embraces an ultimate issue in a case, but may not testify regarding questions

16

of law. (*Summers*, *supra*, 69 Cal.App.4th at pp. 1178-1179.) A trial court may admit expert opinion testimony by an attorney when it determines the trier of fact "could benefit from the opinion of one who, by profession and experience, was peculiarly equipped to evaluate such matters in the context of similar disputes." (*Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 924.)

These same rules apply in the context of disputes over title to property. In *Manhattan Beach*, our Supreme Court noted that the trial court considered expert opinion testimony from surveyors to assist in determining whether a deed using the term "right-of-way" conveyed an easement or a fee simple interest. (*Manhattan Beach*, *supra*, 13 Cal.4th at pp. 249, 263.)

In this case, UE Limited is correct that opinion testimony on a legal issue is inadmissible. (See *Summers*, *supra*, 69 Cal.App.4th at p. 1178.) However, UE Limited has failed to demonstrate the trial court committed reversible error on this ground. First, UE Limited has conceded that it was appropriate for Otay Land to present expert testimony regarding "usages of language at the time" the deeds were executed.[6] Significant portions of the witnesses' testimony were properly admissible as reflected by this concession,

_____

[6] During Hansen's testimony, UE Limited's counsel expressly acknowledged it would be "appropriate" for Hansen to testify about "usages of language at the time." Similarly, UE Limited's counsel conceded that Hansen was "certainly qualified to testify as to the usages of language" and that he had "no problem with him, as an expert, telling [the court] what were the usages of language at the time." In its reply brief, UE Limited argues for the first time that the experts should not have been permitted to testify regarding " 'custom and practices of the language used in conveyance documents.' " By failing to object to this opinion testimony and instead conceding it was admissible in the trial court, UE Limited forfeited this argument on appeal. (See, e.g., *Duronslet v. Kamps* (2012) 203 Cal.App.4th 717, 726 (*Duronslet*) [claim that trial court erred in admitting evidence forfeited by failure to timely object].)

17

and this evidence alone supports the trial court's ruling.  Second, UE Limited has failed to properly preserve its claim of evidentiary error.  Although UE Limited filed a motion in limine to exclude "opinions about who holds title to the Coronado Pipeline Property," and the court denied the motion, the court made clear the witnesses would not be allowed to "give a legal opinion," they could not "tell the [c]ourt what to do," and if there were any questions designed to elicit opinion testimony on a legal issue, the court anticipated "that there's going to be an objection and it'll be sustained."  Contrary to UE Limited's claim, it did not make "repeated objections" to the admission of purported legal opinions.[7]  It therefore forfeited any claim of error. (*Duronslet*, *supra*, 203 Cal.App.4th at p. 726.)  Third, even assuming UE Limited's claim of error was preserved, the claim fails on the merits.  UE Limited contends the court "admitted that it had improperly abdicated to Otay Land's expert the responsibility of deciding what the deeds meant," and that the court further abdicated its role when it admitted the testimony of the

_____

[7]   UE Limited cites over 75 pages in the record when arguing the court erroneously admitted the testimony of experts Boss and Hansen.  UE Limited did not lodge any objections during the cited portions of Boss's testimony. During Hansen's testimony, UE Limited objected when Hansen stated that certain language in the 1912 deed indicated to him that the parties were entering into a "present agreement" rather than a future executory one, and when he was asked whether it was significant that the parties called the 1912 deed "an agreement."  The court attempted to obtain further clarification, stating "Well, I'm not sure what the question actually is," and made clear it was not relying on the expert's opinions to decide the case, stating "I'm reading along with him, whatever.  He's telling me something that seems, to me, pretty obvious."  UE Limited's argument that further objection would be futile is belied by the record, as the court sustained comparable objections by Otay Land.  (*PM Group, Inc. v. Stewart* (2007) 154 Cal.App.4th 55, 63 (*PM Group*) [rejecting claim that further objection would have been futile where trial court sustained at least one objection to challenged testimony].)

18

City's expert. UE Limited's claims are inaccurate and unsupported by the record.[8] Instead, it is clear the trial court understood it was "the [c]ourt's job" to determine the proper interpretation of the documents at the conclusion of the bench trial, and nothing in the record suggests the court improperly relied on any purported legal conclusion offered by the expert witnesses. "Given its comments, the trial court plainly understood its role as arbiter of the law. And because this was a bench trial, there was no danger of jury confusion. In short, we find no error in the court's decision to allow . . . counsel to testify." (*San Lorenzo Valley Community Advocates for Responsible Education v. San Lorenzo Valley Unified School Dist.* (2006) 139 Cal.App.4th 1356, 1420.) Finally, even assuming the experts sometimes strayed into offering opinions on questions of law when discussing the nature of the parties' interests in the Pipeline Strip, any error in admitting such testimony was harmless. (See *PM Group, supra*, 154 Cal.App.4th at p. 64 ["We are confident the admission of the opinion of a single expert on plaintiffs' side to oppose the repeatedly expressed contrary opinion on defendants' side does not require reversal."].)

Turning to the merits, we conclude the trial court's findings regarding the 1912 deed, and the chain of title flowing from that deed, are supported by substantial evidence. Consistent with the parties' presentation of evidence,

---

[8]    To support its claim that the trial court "admitted that it had improperly abdicated" its role, UE Limited cites an isolated reference where the court stated with regard to Hansen: "and that was his legal opinion. That was his testimony, that was his expert opinion." The court made this statement during trial while identifying the issues involved in the case. It was not part of the court's oral intended decision or its subsequent written statement of decision, and does not constitute an admission in any event. Although the court's statement of decision later summarized the witnesses' testimony, as UE Limited correctly notes in its reply, this too is not an admission or expression that the court was abdicating its role.

19

the trial court considered extrinsic evidence in interpreting the 1912 deed.[9]
As stated by the court, it found there was "substantial evidence that the 1912
deed (Ex. 4) clearly intended to convey a fee, and a fee was conveyed." Thus,
contrary to UE Limited's argument that an independent standard of review
must be applied, we instead review the trial court's decision to determine
whether it is supported by substantial evidence. (*Burch*, *supra*,
199 Cal.App.4th at p. 742 [substantial evidence review applies to
interpretation of a writing where the parties present conflicting extrinsic
evidence].)[10]

We start with the general rule that a fee title is presumed to be
intended to pass by a grant of real property unless it appears from the grant
that a lesser estate was intended. (Civ. Code, § 1105.) The 1912 deed does
not demonstrate an intent to pass a lesser estate, but rather includes several
hallmarks of a conveyance of property in fee simple.

---

[9] Although UE Limited contends on appeal that the experts' opinion
testimony should have been excluded or disregarded because no extrinsic
evidence was necessary to interpret the deed, we note that UE Limited itself
relied on extrinsic evidence in interpretating the 1912 deed.

[10] We would reach the same conclusion based on our independent review
of the record. As discussed *post*, the language of the 1912 deed establishes
that a fee interest was conveyed. There are several hallmarks in the deed—
including the granting language, the inheritance language and habendum
clause, multiple references and detailed descriptions to the land that was
conveyed, and the presence of substantial consideration for the property—
which all combine to support the trial court's ruling. Additionally, the word
"easement" is not used to describe the nature of the interest conveyed, and
although the term "right of way" appears in one location (a map attached to
the deed), that term can have dual meanings and does not support UE
Limited's position here. There was no substantial evidence rebutting the
presumption under Civil Code section 1105 that fee title is presumed to pass
by a grant of real property unless it appears from the grant that a lesser
estate was intended.

20

The deed states that the San Diego Land Company "does by these presents *grant* to the said Southern California Mountain Water Company . . . all its right, title and interest in and to the lands described in said Exhibit 'A.' " (Italics added.) The use of the word "grant" is the traditional language used for a conveyance of a fee. (See, e.g., *Severns v. Union Pacific R.R. Co.* (2002) 101 Cal.App.4th 1209, 1215 (*Severns*) ["To convey a fee, all that is required is the word 'grant.' "].) The inheritance language and the habendum clause—"TO HAVE AND TO HOLD, the above granted and described premises unto the Southern California Mountain Water Company, . . . its successors and assigns forever"—are also indicative of a fee conveyance. (See *id*. at pp. 1215-1216.)

The 1912 deed also includes repeated references to "land," demonstrating that land was being transferred, not a mere easement over that land. In the deed, the San Diego Land Company acknowledges it is the "owner of said lands" and conveys "all its right, title and interest in and to the lands described." The property being conveyed is described in "Exhibit A," which defines the property as a "body of land." Exhibit A provides a detailed description of the land and the total acreage being conveyed. "References to 'land,' particularly in conjunction with precise and technical designation of the location, generally indicate an intention to transfer the entire estate not just a limited right to pass over the property." (*Manhattan Beach, supra*, 13 Cal.4th at p. 244.)

The interpretation that the deed conveys the land, rather than mere access to that land via an easement, is further supported by comparing the interest the grantor (San Diego Land Company) retained in the 1912 deed. In the third paragraph of the deed, San Diego Land Company "reserves the right" to establish crossings "*over and across* the lands described in

21

Exhibit 'A.' " (Italics added.) These references to a grantor's limited access "over" or "across" land are consistent with an easement rather than a conveyance of the land. (See *Manhattan Beach*, *supra*, 13 Cal.4th at p. 244.) The use of this language to describe the *grantor's* limited reserved rights, as contrasted to the conveyance of the land to the *grantee*, further supports the conclusion that the 1912 deed conveyed fee simple interest in the Pipeline Strip with the San Diego Land Company (the grantor) retaining only an easement to pass over the land. (*Ibid.*; accord *Los Angeles v. Savage* (1958) 165 Cal.App.2d 1, 3-4, 6 [grant of fee of strip of land to carry electric transmission wires to the city, which conveyance was made " 'subject to reservations and conditions' " allowing grantor to use the land for certain purposes, was interpreted to convey to the city a fee simple interest in the land subject to a retained easement of the grantor].)

Otay Land and the City also relied on the substantial consideration—$8,237.80—paid by the Southern California Mountain Water Company as evidence that a fee simple interest was conveyed rather than an easement, which often involves only a nominal payment.[11] "Where an instrument is ambiguous as to whether a fee or easement was intended, the absence of monetary consideration or its nominal value suggests only an easement was intended." (*Concord & Bay Point Land Co. v. City of Concord* (1991)

---

[11] On appeal, Otay Land relies on an online calculator created by the United States Bureau of Labor Statistics to represent that the sum of $8,237.80 near the time of the 1912 deed is equivalent to nearly $220,000 in present-day dollars. UE Limited does not object to this representation, but we decline to take judicial notice of the calculator or rely on it to reach our conclusion because no party made a proper request for judicial notice as required by California Rules of Court, rule 8.252(a), or otherwise established the reliability of the calculation. (See *United Teachers of Los Angeles v. Los Angeles Unified School Dist.* (2012) 54 Cal.4th 504, 528.)

229 Cal.App.3d 289, 294.) The sum paid in the 1912 deed further supports the conclusion that a fee simple interest, not an easement, was conveyed.

Additionally, the 1912 deed does not use the word "easement," and there is no other limiting language supporting UE Limited's interpretation of the 1912 deed. Although the 1912 deed notes that the land was to be used for a pipeline, it does not state that the property may *only* be used for a pipeline. (Cf. *Handlery*, *supra*, 155 Cal.App.4th at p. 574 [deed contained clear language of grantors' intention to restrict use of property "only" to specific purposes].) Without the use of the word "only" or other terms or references indicating an intent to limit the interest conveyed to an easement, the reference to a certain intended use "merely constitutes a description of the intended purpose of the land rather than a limitation on its grant." (*Machado v. Southern Pacific Transportation Co.* (1991) 233 Cal.App.3d 347, 357-359 (*Machado*); see also *Basin Oil Co. v. Inglewood* (1954) 125 Cal.App.2d 661, 664 ["[T]he vast majority of cases hold the transfer of a fee title is not vitiated solely for the reason that the deed contains a clause declaring the purpose for which it is intended the granted premises shall be used."].)

Against this substantial evidence, UE Limited relies on the words "right of way" handwritten on a plat map found in Exhibit A of the 1912 deed. UE Limited also relies on extrinsic evidence in the form of a subsequent 1914 deed, which similarly uses the term " 'right of way' " to refer to the Pipeline Strip, to assert that the Southern California Mountain Water Company acquired only an easement. And UE Limited additionally relies on Civil Code section 801, which provides that "[t]he right-of-way" may be called an

23

easement.[12]  Under the substantial evidence standard of review, however, "[w]e do not review the evidence to see if there is substantial evidence to support the losing party's version of events, but only to see if substantial evidence exists to support the verdict in favor of the prevailing party."  (*Pope v. Babick* (2014) 229 Cal.App.4th 1238, 1245.)

Even considering UE Limited's arguments regarding a "right of way," this single phrase in an attachment to the deed does not establish the 1912 deed created only an easement.  Case law establishes that although the term "right of way" *may* refer to an easement, a "right of way" may also be a fee simple interest.  In *Manhattan Beach*, the California Supreme Court held that a deed that included the term "right-of-way" transferred an entire fee interest, not an easement.  (*Manhattan Beach*, *supra*, 13 Cal.4th at pp. 235, 249-250.)  Similarly, in *Machado*, *supra*, 233 Cal.App.3d 347, 351, the court concluded that a deed transferring a " 'certain strip or parcel of land for a right of way' " was a grant of a fee interest, not an easement.  The court in *Machado* explained that "the use of the term 'right of way' in a deed does not determine whether the interest so described constitutes an easement or a fee.  Our courts have recognized that the use of that term can mean both an easement and the land held in fee simple which is *used* as a right of way."  (*Id.* at p. 354; see also *Severns*, *supra*, 101 Cal.App.4th at p. 1216 [concluding transfer of a " ' "strip of land" ' " for a " ' "right-of-way" ' " was an unambiguous transfer of a fee simple interest].)

UE Limited tries to cabin these holdings regarding the dual meaning of the term " 'right of way,' " asserting that the use of the term " 'right of way' "

12    Specifically, Civil Code section 801, subdivision (4) provides in relevant part:  "The following land burdens, or servitudes upon land, may be attached to other land as incidents or appurtenances, and are then called easements: [¶] . . . [¶]  4.  The right-of-way[.]"

to refer to a fee interest in property applies only to "railroads, canals, and similar *instrumentalities of transportation*." (Italics added.) To support this assertion, UE Limited cites *Manhattan Beach*, which held that "courts have also concluded 'the term "right of way," when applied to *railroads, canals, and similar instrumentalities*, has no exact, well-defined meaning, but often is susceptible of a twofold signification. It is used indiscriminately to describe, not only the easement, or special and limited right to use another person's land, but as well the strip of land itself that is occupied for such use.' " (*Manhattan Beach, supra*, 13 Cal.4th at p. 241.) Notably, the California Supreme Court did not include the limitation to "instrumentalities of *transportation*" added by UE Limited. The decision does not support the claim that a pipeline right-of-way must, as a matter of law, describe only an easement rather than a fee interest. The term right-of-way is merely descriptive of the purpose for which the strip of land may be used—here, as a pipeline—which "frequently require[s] a long strip of land along a particular route. This is consistent with the ordinary understanding of the words 'right of way.' " (*Miro v. Superior Court* (1970) 5 Cal.App.3d 87, 97 [addressing an eminent domain case].)

The context in which the "right of way" language is used is also significant. The 1912 deed does not refer to a grant of a right-of-way, but rather a grant of specifically-defined land. The reference to a "right of way" is not contained within the granting clause itself and appears after other key language discussed above. It instead is handwritten on a map which is part of an exhibit to the deed. Despite the ambiguous reference to a right-of-way, substantial evidence supports the trial court's conclusion that the 1912 deed included a grant of a fee simple interest in the Pipeline Strip, not only an easement.

25

UE Limited raises additional arguments on appeal regarding the 1914 deed and subsequent conveyances. None is relevant or persuasive given UE Limited's concession that it cannot prevail if the trial court correctly interpreted the 1912 deed.[13] We have already concluded the trial court's interpretation of the 1912 deed is supported by substantial evidence, rendering UE Limited's remaining arguments moot. We need not address the remaining instruments in the chain of title in extensive detail. The following summary suffices and is supported by substantial evidence in the record: In 1914, the Southern California Mountain Water Company transferred its interest in the entirety of the "Highland Reservoir Pipe Line."[14] Included in the sale were "certain lots, pieces or parcels of real property and property rights situated in the County of San Diego," including

[13]    At trial, the court suggested the alternative chain of trial UE Limited was advancing would be irrelevant "if, hypothetically, the 1912 deed from San Diego Land Company to California—Southern California Mountain Water Company conveys a fee simple conveyance of the pipeline corridor or the pipeline strip . . . and if that deed conveys fee simple ownership of the pipeline corridor and then there is a tracing of subsequent deeds conveying the exact same described property." UE Limited's counsel responded, "I absolutely agree with that." The trial court continued, "I mean, any other transaction from San Diego water company or anybody else is completely irrelevant," and if the 1912 deed "transferred a fee, all of this other stuff [regarding the chain of title advanced by UE Limited] is confusing and completely irrelevant, isn't it?" UE Limited's counsel again stated, "I'm agreeing with the Court." Although we need not address it, we additionally note that UE Limited relies heavily on a later June 5, 1912 agreement— which it contends "immediately superseded" the 1912 deed—to support its chain of title. However, this argument necessarily fails because the June 5 agreement was never introduced as an exhibit at trial and is not part of the record on appeal.

[14]    The parties do not dispute that this pipeline encompasses what the parties refer to as the Coronado Pipeline with the Pipeline Strip.

26

the Pipeline Strip, described as a "right-of-way, one hundred feet in width, being twenty feet on the north side of the Otay-Coronado Pipe Line, known and designated as the Highland Reservoir Pipe Line, and eighty feet on the south side of said pipe line, being the right of way granted by the San Diego Land Company to the Southern California Mountain Water Company by [the 1912 deed.]" By referencing the 1912 deed, the 1914 deed indicates that the same interest that was conveyed in the 1912 deed was being conveyed by the 1914 deed. (*Kraemer v. Kraemer* (1959) 167 Cal.App.2d 291, 301 ["When a deed refers to other instruments the latter become a part of the former, and all of them must be considered as a whole to determine the intention of the parties."].) As already discussed, a fee simple interest was transferred in the 1912 deed; the same is therefore true regarding the 1914 deed. In 1935, the Coronado Water Company conveyed fee interest in the Pipeline Strip to the California Water & Telephone Company. In 1961, the California Water & Telephone Company conveyed the Pipeline Strip to the City. In 1964, the City quitclaimed to UE Limited's predecessor "all its right, title and interest in and to all that real property" in the Pipeline Strip *except* the 2.7-acre parcel and a 25-foot-wide strip, composed of the twelve and a half feet on either side of the physical pipeline. The City then transferred the 2.7-acre parcel to Otay Land in 2018. In summary, there is substantial evidence supporting a chain of title starting from the 1912 deed, conveying a fee interest to the Pipeline Strip, and ending with the 2018 transfer of fee title from the City to Otay Land of the 2.7-acre parcel within the Pipeline Strip on Lot 27.

Finally, UE Limited's reliance on Civil Code section 801 to support its argument that the deed only conveyed an easement is misplaced. This statute identifies a right-of-way as one possible type of easement (Civ. Code,

27

§ 801, subd. (4)).  "Seventeen other examples of easements are listed [in Civil Code section 801].  Contrary to what [UE Limited] appears to suggest, this does not create a presumption of an easement when a deed uses the phrase 'right-of-way.'  Civil Code section 801 is simply a statutory listing of different types of easements." (*Severns, supra,* 101 Cal.App.4th at p. 1215, fn. 2.)  This statute is entirely consistent with the case law discussed *ante*, holding that the term right-of-way can be construed as either a fee or an easement depending on the particular instrument at issue.

### 2. *Application of the Public Utilities Act*

UE Limited asserts that the 1912 deed is void and therefore cannot form the basis for Otay Land's and the City's claims regarding their subsequent interests in the Pipeline Strip.  To support this assertion, UE Limited relies on the Public Utilities Act, Public Utilities Code section 201 et seq. (Public Utilities Act), which first became effective in March 1912, days before the agreement underlying the 1912 deed was executed.[15]  (See *Pacific Tel. & Tel. Co. v. Eshleman* (1913) 166 Cal. 640, 667.)  The Public Utilities Act vested the Railroad Commission (now the Public Utilities Commission) with new authority to regulate public utilities.  (See generally *Sale v.*

---

[15]    The Public Utilities Act has undergone numerous amendments since 1912 and the sections relevant to UE Limited's argument have been significantly amended or repealed.  The trial court took judicial notice of the Public Utilities Act as it existed at the time of the 1912 deed.  We refer in this opinion to the sections as enacted at the time of the 1912 deed unless otherwise stated.  (Stats. 1911, Ex.Sess., ch. 14, § 1.)  In a footnote in its reply brief, UE Limited requests that this court take judicial notice of a website detailing the history of the Public Utilities Commission.  We decline to consider the request due to the failure to follow the requirements of rule 8.252(a) of the California Rules of Court.  (*Tenet Healthsystem Desert, Inc. v. Blue Cross of California* (2016) 245 Cal.App.4th 821, 834-835 [party seeking judicial notice on appeal must file separate motion meeting requirements of rule 8.252].)

*Railroad Com. of California* (1940) 15 Cal.2d 612, 618 [Railroad Commission "is an active instrument of government charged with the duty of supervising and regulating public utility services and rates."].)

As part of this new authority, the Railroad Commission was vested with the duty to authorize all sales of utility systems, including water systems. (*Crum v. Mt. Shasta Power Corp.* (1934) 220 Cal. 295, 310.) Section 51, subdivision (a) of the Public Utilities Act provided that "[n]o . . . water corporation shall henceforth sell, lease, assign, mortgage or otherwise dispose of or encumber the whole or any part of its . . . system, necessary or useful in the performance of its duties to the public . . . without having first secured from the commission an order authorizing it so to do." Any sale made without the commission's authorization "shall be void." (*Ibid.*) However, the section expressly states that it does *not* prevent "the sale, lease or other disposition by any public utility . . . of property which is not necessary or useful in the performance of its duties to the public, and any sale of its property by such public utility shall be conclusively presumed to have been of property which is not useful or necessary in the performance of its duties to the public, as to any purchaser of such property in good faith for value." (*Ibid.*) "The section refers to property dedicated to public use." (*City of Oakland v. El Dorado Terminal Co.* (1940) 41 Cal.App.2d 320, 328 [construing comparable language in 1927 statute]; see also *Henderson v. Oroville-Wyandotte Irrigation Dist.* (1931) 213 Cal. 514, 529-530 ["No sale of property burdened with a public use is legal, or of any validity whatever,

unless the authority to make such sale is first given by the Railroad Commission."].)[16]

Here, the trial court indicated in its statement of decision that there was no evidence introduced at trial establishing it was necessary to obtain commission approval of the 1912 deed. As the trial court explained: "[T]he grantor to the 1912 deed was not a public utility; it was a land company. The grantee to the 1912 deed, Southern California Mountain Water Company, might have been a public utility, but there was no evidence presented to support a contention that a public utility needed Railroad Commission approval in 1912 to accept a grant of land. UE [Limited] failed to introduce any evidence or testimony on whether either party to the 1912 deed (Ex. 4) was a public utility for purposes of the Public Utilities Act. No corporate documentation was proffered related to either the grantee or grantor within Exhibit 4, and no expert was designated in relation to the Public Utilities Act or the relationship of the conveyance within Exhibit 4 to the subject matter of the Public Utilities Act." The trial court further found this issue was only raised at "the very end of the trial" after UE Limited had rested. We review the trial court's factual findings under a substantial evidence standard of review and we independently review legal issues regarding the statute's

---

16     The current statute contains almost identical provisions. (See Pub. Util. Code, § 851, subd. (a); see also *id*., subd. (c) ["This section does not prevent the sale, lease, encumbrance, or other disposition by any public utility of property that is not necessary or useful in the performance of its duties to the public, and any disposition of property by a public utility shall be conclusively presumed to be of property that is not useful or necessary in the performance of its duties to the public, as to any purchaser, lessee, or encumbrancer dealing with that property in good faith for value, provided that this section does not apply to the interchange of equipment in the regular course of transportation between connecting common carriers."].)

30

applicability. (*General Mills, Inc. v. Franchise Tax Bd.* (2012) 208 Cal.App.4th 1290, 1302-1303.)

We conclude substantial evidence supports the trial court's ruling and we reject UE Limited's contention that the 1912 deed was void based on operation of the Public Utilities Act. As set forth *ante*, section 51, subdivision (a) of the Public Utilities Act required commission approval for the sale of a water system *by* a water corporation. The 1912 deed, however, involved a sale *to* a water corporation of the Pipeline Strip.[17] None of the parties contends that the grantor who conveyed the Pipeline Strip, San Diego Land Company, was a water corporation. Accordingly, San Diego Land Company was not a regulated utility subject to the commission's jurisdiction. Its transfer of real property in the 1912 deed was *not* subject to the Public Utilities Act and did not require commission authorization.[18]

[17] For purposes of this decision, we assume without deciding that the Southern California Mountain Water Company constitutes a "water corporation" within the meaning of section 51 of the Public Utilities Act.

[18] In its reply brief, UE Limited cites section 31 of the Public Utilities Act and contends the commission has "the power to regulate and control all the public utilities of the state in all of their actions, *whether purchasing or selling property*." (Italics modified.) Section 31 does not support UE Limited's claim. (See § 31 ["The railroad commission is hereby vested with power and jurisdiction to supervise and regulate every public utility in the state and to do all things, whether herein specifically designated or in addition thereto, which are necessary and convenient in the exercise of such power and jurisdiction."].) This general language regarding the commission's power to regulate public utilities does not override the specific language in section 51, or establish that commission approval of the 1912 deed was required. Section 51 makes clear that it operates to void only the *sale* of specified types of property by a public utility without commission approval. UE Limited points to no other authority supporting its argument that Southern California Mountain Water Company's *purchase* of the Pipeline Strip fell within the purview of section 51.

31

UE Limited asserts that aside from the transfer of the Pipeline Strip, the 1912 deed also contained transfers of real property from the Southern California Mountain Water Company to the San Diego Land Company such that the Public Utilities Act nevertheless applies. In a separate part of the 1912 deed (the fifth paragraph), the Southern California Mountain Water Company "does by these presents remise, release and forever quitclaim unto the said San Diego Land Company . . . all of the lands described" in earlier agreements between the parties. The earlier agreements are not part of the record. UE Limited contends that this paragraph, which it asserts is not severable, was subject to the Public Utilities Act because it involved a transfer of land by a water corporation (Southern California Mountain Water Company) to another party.

However, section 51, subdivision (a) of the Public Utilities Act exempts from commission review and approval the transfer of any real property "which is *not* necessary or useful in the performance of its duties to the public." (Italics added.) UE Limited makes no attempt to establish what duties Southern California Mountain Water Company purportedly owed the public. It further fails to describe the property transferred by the Southern California Mountain Water Company or to explain how the transfer of those lands fell within the approval jurisdiction of the Railroad Commission.[19] As

_____

[19] The Public Utilities Act only applies, as relevant to this action, to transfers of a " 'water system,' " defined in section 2, subdivision (w) as including "all reservoirs, tunnels, shafts, dams, dikes, head-gates, pipes, flumes, canals, structures and appliances, and all other real estate, fixtures and personal property, owned, controlled, operated or managed in connection with or to facilitate the diversion, development, storage, supply, distribution, sale, furnishing, carriage, apportionment or measurement of water for power, irrigation, reclamation or manufacturing, or for municipal, domestic or other beneficial use."

32

noted, the earlier agreements describing the transferred land—which were apparently entered into in 1901—are not part of the record. Nothing in the record supports the conclusion that this property was necessary or useful to a water system or to the performance of any public functions the Southern California Mountain Water Company may have owed to the public.[20]

In sum, as the trial court concluded, the 1912 deed was not void based on the failure to obtain commission approval.[21]

### 3. *Application of the Subdivision Map Act*

UE Limited argues that, assuming the City owned the Pipeline Strip, the division of a 2.7-acre portion of it for sale to Otay Land in 2018 violated the Subdivision Map Act (Gov. Code, § 66410 et seq.). We review this issue de novo. (*Le Gault v. Erickson* (1999) 70 Cal.App.4th 369, 372 (*Le Gault*).)

Generally, the Subdivision Map Act establishes a range of requirements that must be fulfilled before a local governmental agency approves a subdivision of real property into multiple parcels. (See, e.g., *Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles* (2012) 55 Cal.4th 783, 798-800.) "To enforce its important public purposes, the [Subdivision Map] Act generally prohibits the sale, lease, or financing of any

---

[20] Although UE Limited cites the 1912 decision of the Railroad Commission, the decision is not sufficient to fill the gaps in the record. Notably, the relevant portion of the strip conveyed by the 1912 deed is not part of the description in the decision of the property being sold and leased. There was no reliable testimony establishing how (if at all) the decision relates to the 1912 deed or the Pipeline Strip at issue in this case.

[21] Because we conclude the trial court correctly found that the Public Utilities Act did not require commission authorization for the 1912 deed, we need not consider the alternative arguments by Otay Land and the City regarding severability and whether a subsequent 1914 Railroad Commission decision ratified the earlier 1912 transfer.

parcel of a subdivision until the recordation of an approved map in full compliance with the law. ([Gov. Code,] § 66499.30, subds. (a), (b), (c).)" (*Gardner v. County of Sonoma* (2003) 29 Cal.4th 990, 999.) "[A] buyer has the right under [Government Code] section 66499.32 [subdivision] (a) to void a contract to sell real property that 'has been divided . . . in violation of the provisions of [the Subdivision Map Act],' and may exercise that right at the buyer's 'sole option' within one year after the date of discovery of the violation." (*Black Hills Investments, Inc. v. Albertson's, Inc.* (2007) 146 Cal.App.4th 883, 894 (*Black Hills Investments*).)

As the trial court noted, however, UE Limited's operative cross-complaint does not include a cause of action based on the Subdivision Map Act and it failed to assert an affirmative defense on this ground.[22] The Subdivision Map Act also expressly does not apply to a conveyance of land to or from a governmental agency like the City here. (See Gov. Code, § 66426.5 ["Any conveyance of land *to or from* a governmental agency, public entity, public utility, or subsidiary of a public utility for conveyance to that public utility for rights-of-way shall not be considered a division of land for purposes of computing the number of parcels."], italics added; *id.*, § 66428, subd. (a)(2) [conveyance to or from governmental agency, public entity, or public utility does not require parcel map except on individualized showing that public

---

[22]    We reject UE Limited's claim that a sentence in its declaratory relief cause of action asserting that the 2018 conveyance " 'is void and of no effect to transfer any ownership of UE's 100-foot strip' " was sufficient to state a claim under the Subdivision Map Act. The statute was never cited or even mentioned in UE Limited's cross-complaint or answer. UE Limited further asserts it raised the issue in discovery, but it only cites to arguments of counsel which are not evidence. UE Limited did mention the Subdivision Map Act in its trial brief and a motion during trial, but it cites no authority holding that this is a permissible method to adjudicate an issue that was not before the court based on the parties' pleadings.

policy requires parcel map in particular case].) We need not address UE Limited's contention that this exception does not apply to conveyances *from* a governmental agency like the City here.[23] As we next discuss, there are other fundamental problems with UE Limited's claim that preclude it from obtaining the relief it seeks.

As a threshold matter, UE Limited has not shown that it has standing to assert a violation of the Subdivision Map Act in this case. A conveyance in violation of the Subdivision Map Act is voidable at the *grantee's* sole option within one year after discovery of the violation. (*Black Hills Investments*, *supra*, 146 Cal.App.4th at p. 894.) UE Limited is not a grantee entitled to seek this relief.[24] (*Le Gault*, *supra*, 70 Cal.App.4th at p. 375 [the buyer had the sole choice of voiding a deed under the Subdivision Map Act; junior lienholder lacked standing to assert a claim based on the alleged violation].)

Even if UE Limited had standing, its claim based on the Subdivision Map Act still fails because even assuming a violation occurred, it has no effect on title to the 2.7 acres. As the Court of Appeal explained in *Save Mount Diablo v. Contra Costa County* (2015) 240 Cal.App.4th 1368, 1379, footnote 8: "[A]lthough it is illegal for an owner to convey parts of a landholding in the absence of a recorded map ([Gov. Code,] § 66499.30, subds. (a) & (b)), such a conveyance is nonetheless effective to transfer title to the illegally conveyed portion. The grantee is not subject to criminal penalties and has the right, within one year of discovery, to void such a

---

23    We note, however, that the statute plainly states that the exception from the Subdivision Map Act requirements applies to specified conveyances "to or from a governmental agency" (Gov. Code, § 66426.5), not just conveyances "to" a governmental agency.

24    Nor did UE Limited seek injunctive relief under Government Code section 66499.33 prior to the sale of the 2.7-acre parcel.

transfer ([*Id*.,] § 66499.32, subd. (a)), but the local agency does not have a similar power. [Citations.] Accordingly, as both a practical and legal matter, a division of property through an illegal conveyance, if not voided by the transferee, is effective to subdivide property." Here, as noted, Otay Land as the grantee/transferee is not attempting to void the conveyance. Transactions that violate the Subdivision Map Act are not automatically invalid. Thus, even assuming the 2018 conveyance violated the Subdivision Map Act, it has no bearing on the controversy raised in this action regarding title to the 2.7-acre parcel.[25] The 2018 conveyance was effective to transfer title from the City to Otay Land.

4. *The Trial Court's Limits on Expert Witness Testimony*

In its final argument regarding the 2.7-acre parcel, UE Limited contends the trial court abused its discretion by not permitting two of its experts to testify regarding interpretation of the 1912 deed. The trial court excluded some testimony from each witness for different reasons, which we consider in turn.

" 'The trial court's determinations on the admissibility of expert evidence are subject to review under the deferential abuse of discretion standard.' " (*Burton v. Sanner* (2012) 207 Cal.App.4th 12, 22.) "A judgment will not be reversed due to the erroneous exclusion of evidence unless it appears, upon examining the entire cause, including the evidence, a miscarriage of justice has resulted. (Cal. Const., art. VI, § 13; Evid. Code, § 354.) A miscarriage of justice occurs only when the reviewing court is convinced it is reasonably probable a result more favorable to the appellant

---

25    As we discuss *post*, UE Limited raises a separate argument regarding the effect of Otay Land's alleged violation of the Subdivision Map Act on its claim for adverse possession.

would have been reached absent the error." (*California Crane School, Inc. v. National Com. for Certification of Crane Operators* (2014) 226 Cal.App.4th 12, 24.)[26]

Before trial, the trial court informed the parties that they "get one expert per issue per side." In response to that limitation, UE Limited represented that its real estate expert, John Hosack, would testify regarding "title chain" opinions while its other expert, Michael Pallamary, would testify regarding surveying issues and "his research of . . . digging up the chain [of title]."

During its case-in-chief, UE Limited called Pallamary to testify as its first expert witness. Counsel for UE Limited asked Pallamary whether a reference to a "right-of-way" could be "used to equate to a fee" rather than an easement. Otay Land objected, noting the court's ruling allowing only one expert per issue and UE Limited's representation that Hosack would be the expert testifying regarding the interpretation of the deeds at issue. The court allowed limited testimony from Pallamary regarding the distinction between an easement and fee title, but warned counsel to not "run afoul" of the limitation on expert witnesses. Later in Pallamary's testimony, UE Limited's counsel again had to be reminded of this limitation. When UE Limited's

_____

[26]    In its opening brief, UE Limited asserts that "when expert testimony has been erroneously excluded, that error is reversible *per se*." UE Limited relies on *Gordon v. Nissan Motor Co., Ltd.* (2009) 170 Cal.App.4th 1103, 1114, which held that the exclusion of expert testimony is reversible per se *only* "when a trial court erroneously denies *all* evidence relating to a claim, or *essential* expert testimony without which a claim cannot be proven." Neither situation applies here. In addition, because we conclude the trial court's evidentiary rulings were not erroneous, we need not address UE Limited's arguments regarding prejudice. (See *Center for Biological Diversity v. County of San Bernardino* (2016) 247 Cal.App.4th 326, 332; *Deutsch v. Masonic Homes of California, Inc.* (2008) 164 Cal.App.4th 748, 768, fn. 9.)

counsel asked Pallamary about the 2018 deed transferring title to the 2.7-acre parcel, Otay Land objected. When the court asked which expert was designated to testify about the deeds in the relevant chain of title, UE Limited's counsel stated, "We're going to have an expert, your Honor, tracing the chain of title. [¶]. . .[¶] And that's what Mr. Hosack is going to be testifying to." The court reminded UE Limited, "you've got your expert" to respond to Otay Land's expert testimony regarding the chain of title, "but you don't do it twice." Undeterred, UE Limited's counsel later asked Pallamary what the term " 'right-of-way' " refers to in a surveying map. Otay Land objected on the basis that UE Limited was "double dipping" to get two experts to testify on the interpretation of the deeds, violating the trial court's limitation on repetitive expert witnesses. The trial court sustained the objection.

On appeal, UE Limited challenges the exclusion of Pallamary's testimony, asserting that it "was essential to the proper interpretation of the 1912 Agreement and the parties' disputed chains of title." UE Limited does not address the basis for the trial court's limitation of Pallamary's testimony. In accordance with a San Diego Superior Court local rule, the trial court limited each party to one expert per issue.[27] Moreover, Evidence Code section 723 provides that a trial court "may, at any time before or during the trial of an action, limit the number of expert witnesses to be called by any party." This court has upheld this limitation on expert witness testimony and UE Limited makes no attempt to argue the rule is otherwise improper or inapplicable. (See *South Bay Chevrolet v. General Motors Acceptance Corp.*

[27]     Superior Court of San Diego County, Local Rules, rule 2.1.11 provides that "[i]t is the policy of the court that parties are limited to one expert per field of expertise per side, pursuant to Evidence Code section 723, absent a court order to the contrary."

(1999) 72 Cal.App.4th 861, 906.) UE Limited did not dispute this rule as applied during trial and elected to question its other expert witness, Hosack, regarding interpretation of the relevant deeds and records. Based on this record, the trial court did not abuse its discretion in excluding Pallamary's duplicative expert testimony. (*Ibid*.)

UE Limited acknowledges it relied on its other expert, Hosack, to testify regarding "the meaning of the various deeds and agreements constituting the chain of title for the [Pipeline Strip]." As part of Hosack's testimony, UE Limited's counsel asked him what he "interpreted [the 1912 deed] to be." Otay Land's counsel objected, noting that interpretation of the 1912 deed was beyond the scope of Hosack's deposition testimony. Although Hosack represented that he was questioned about the 1912 deed in his deposition, he later clarified that his deposition testimony regarding that deed was limited to opining that the deed was void due to not receiving approval from the Railroad Commission, as discussed *ante.* Counsel for Otay Land represented to the court that at Hosack's deposition, he asked if Hosack had expressed all of his opinions and Hosack pledged that he had and committed to inform Otay Land if he formed any new opinions arising out of his examination of the documents he had reviewed. The trial court sustained the objection and did not allow Hosack to testify regarding his opinions about the interpretation of the 1912 deed.

UE Limited contends the trial court abused its discretion in excluding Hosack's expert opinion testimony. It reiterates the argument it made at trial that during a deposition, "if the question isn't asked, the expert has no duty to volunteer." The trial court rejected this contention and so do we.

"The Legislature has singled out the pretrial discovery of expert opinions for special treatment. When appropriate demand is made for

39

exchange of expert witness lists, the party is required to disclose not only the name, address and qualifications of the witness but the *general substance* of the testimony the witness is expected to give at trial. [Citation.] In our view, this means the party must disclose either in his witness exchange list or at his expert's deposition, if the expert is asked, the substance of the facts and the opinions which the expert will testify to at trial. Only by such a disclosure will the opposing party have reasonable notice of the specific areas of investigation by the expert, the opinions he has reached and the reasons supporting the opinions, to the end the opposing party can prepare for cross-examination and rebuttal of the expert's testimony." (*Kennemur v. State of California* (1982) 133 Cal.App.3d 907, 919 (*Kennemur*).) Thus, when an expert offers certain specific opinions during his deposition, offers that those were his only opinions, and states that he will notify counsel if he forms new opinions before trial, a trial court may justifiably exclude testimony at trial going beyond the opinions expressed during the deposition. (*Jones v. Moore* (2000) 80 Cal.App.4th 557, 564-565 (*Jones*) [holding that even when an expert witness declaration arguably was broad enough to encompass the line of questioning sought to be presented at trial, "[w]hen an expert deponent testifies as to specific opinions and affirmatively states those are the only opinions he intends to offer at trial, it would be grossly unfair and prejudicial to permit the expert to offer additional opinions at trial"]; see also *Easterby v. Clark* (2009) 171 Cal.App.4th 772, 780 ["a party's expert may not offer testimony at trial that exceeds the scope of his deposition testimony *if* the opposing party has no notice or expectation that the expert will offer the new testimony, or *if* notice of the new testimony comes at a time when deposing the expert is unreasonably difficult"].)

40

On appeal, UE Limited relies on other authority that establishes that although an expert must disclose the "general substance" of his opinions before trial, the failure of opposing counsel to discover each specific detail and fact underlying those opinions does not require the exclusion of testimony regarding those details at trial. (See *Cooper v. Takeda Pharmaceuticals America, Inc.* (2015) 239 Cal.App.4th 555, 594-595; *Williams v. Volkswagenwerk Aktiengesellschaft* (1986) 180 Cal.App.3d 1244, 1257-1258.)

Those cases, however, have no bearing on the trial court's decision in this case. Otay Land objected to Hosack's trial testimony regarding the interpretation of the 1912 deed because he offered no general opinion on that document at his deposition beyond his belief the deed was void due to not being approved by the Railroad Commission. His failure to offer any general opinion regarding the interpretation of the words used in the 1912 deed forecloses his testimony at trial regarding that same general opinion.

UE Limited also suggests on appeal that Otay Land "failed to offer any evidence from Mr. Hosack's deposition that supported their objection." The record suggests otherwise. At trial, after counsel for Otay Land read from Hosack's deposition transcript, Hosack himself testified regarding the scope of opinions offered at his deposition. The trial court allowed the parties to take a break to review the deposition transcript and, following that break, UE Limited made no effort to demonstrate that counsel for Otay Land was misrepresenting the scope of Hosack's opinions offered at the deposition. Instead, Hosack confirmed the opinion he provided at his deposition regarding the 1912 deed was limited to concluding the deed was void for failure to obtain approval from the Railroad Commission. Hosack also admitted he offered no opinions at his deposition regarding the 1914 deed, discussed *ante*, another key document at trial. After another break, UE

41

Limited's counsel informed the court that she had a chance to review Hosack's deposition transcript and his discussion of the 1912 deed and then proceeded to ask only about the issue arising from the Railroad Commission approval. Although the transcript of Hosack's deposition was not admitted into evidence, the record sufficiently establishes that Hosack did not offer the opinions excluded at trial during his deposition. And UE Limited has not offered any evidence to the contrary. Based on the record before it, the trial court did not abuse its discretion in excluding Hosack's previously undisclosed opinions regarding the interpretation of the 1912 deed and other relevant documents in the chain of title. (See *Jones*, *supra*, 80 Cal.App.4th at p. 565 ["[w]hen an expert deponent testifies as to specific opinions and affirmatively states those are the only opinions he intends to offer at trial, it would be grossly unfair and prejudicial to permit the expert to offer additional opinions at trial"]; accord, *Kennemur*, *supra*, 133 Cal.App.3d at p. 920.)

C. *Otay Land's Adverse Possession Claim*

Aside from the 2.7-acre parcel and a 25-foot-wide strip claimed by the City, the trial court found that Otay Land obtained the remainder of the Pipeline Strip through adverse possession. UE Limited challenges this finding on appeal.

"Adverse possession is a means to acquire ownership of land." (*Silacci v. Abramson* (1996) 45 Cal.App.4th 558, 562.) "The elements of adverse possession are well established. 'To establish title by adverse possession, the claimant must establish five elements in connection with his occupancy of the property. [Citations.] (1) Possession must be by actual occupation under such circumstances as to constitute reasonable notice to the owner. [Citations.] (2) Possession must be hostile to the owner's title. [Citations.]

42

(3) The holder must claim the property as his own, either under color of title, or claim of right.  [Citation.]  (4) Possession must be continuous and uninterrupted for five years.  [Citations.]  (5) The possessor must pay all of the taxes levied and assessed upon the property during the period. [Citation.]  Unless each one of these elements is established by the evidence, the plaintiff has not acquired title by adverse possession.' " (*Nielsen v. Gibson* (2009) 178 Cal.App.4th 318, 325 (*Nielsen*); see also Civ. Code, § 1007, Code Civ. Proc., §§ 324, 325.)  We review the trial court's factual findings as to each element under the substantial evidence standard of review.  (*Aguayo v. Amaro* (2013) 213 Cal.App.4th 1102, 1109 (*Aguayo*).)

             1. *Evidence Related to Otay Land's Exclusive Use*

On appeal, UE Limited makes only a limited challenge to the court's finding regarding the first four elements of Otay Land's adverse possession claim.  It asserts the trial court erred in excluding certain testimony by one of its witnesses, Christopher Patek, and some accompanying exhibits that UE Limited believed were relevant to the issue of whether Otay Land exercised exclusive control over the property.  We disagree.

In its complaint, filed in 2013, Otay Land alleged the relevant five-year period of adverse possession occurred during its ownership of Lot 27 from 1998 until the filing of the lawsuit.  At trial, Otay Land focused on establishing the elements of adverse possession for the Pipeline Strip within Lot 27 during the five-year period starting in 2007 until the lawsuit was filed in early 2013.  During its case-in-chief, Otay Land presented evidence that during that five-year period, it built fences and gates around the Pipeline Strip, restricted access by the public, and hired a person to farm the property.

Otay Land called Patek to testify as an adverse witness pursuant to Evidence Code section 776.  Patek explained he was a property manager for

UE Limited since 2013. Patek testified that several times a year, he viewed the Pipeline Strip from a nearby freeway "pull-out." On at least one occasion, he observed people running farm equipment on the Pipeline Strip. Patek also testified that before visiting the property as part of this litigation in 2017, he had last visited the property sometime before 2005. Patek subsequently changed his testimony to claim he visited the Pipeline Strip in 2015, after the lawsuit was filed, by climbing under a fence.

The trial court required UE Limited to combine its cross-examination of Patek as Otay Land's adverse witness and its own direct examination of Patek.[28] Despite Patek's testimony that he did not visit the Pipeline Strip during the five-year period preceding the lawsuit, counsel for UE Limited asked Patek a series of questions about whether Otay Land had constructed barriers to restrict access to the Pipeline Strip. The trial court sustained Otay Land's objections to this testimony on the basis that Patek had not visited the property during the relevant time period, he lacked the foundation to answer the question, and any response regarding access during a different time period would be irrelevant. Acknowledging that Patek had not visited until after the lawsuit was filed, counsel for UE Limited suggested that "there is an inference that if you could access it today, you could have

_____

[28]   In a conclusory argument, UE Limited asserts the trial court erred in not following the normal order of evidence at trial. As UE Limited acknowledges, the trial court has broad discretion in regulating the order of proof and we will not disturb the trial court's management of trial absent a clear showing of abuse of discretion. (*Rayii v. Gatica* (2013) 218 Cal.App.4th 1402, 1413.) The trial court consolidated Patek's testimony out of concerns regarding the length of trial, which was extending beyond the parties' estimates. UE Limited fails to establish that it was prejudiced by the trial court's case management or that the trial court in any way abused its discretion.

accessed it in past years, absent some evidence that they've taken away the access." The court disagreed and excluded Patek's testimony in this regard.

Later, UE Limited asked Patek about a series of photographs he took of the Pipeline Strip in 2017. UE Limited proffered that these photographs of open gates in 2017 supported an inference that the gates were open during the period of adverse possession. The court again sustained Otay Land's objections that the photographs were not relevant.

On appeal, UE Limited argues that the exclusion of Patek's testimony and photographs was "[i]mproper." We review the trial court's evidentiary rulings under the abuse of discretion standard of review. (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 281.) "This is particularly so with respect to rulings that turn on the relevance of the proffered evidence. [Citation.] This standard is not met by merely arguing that a different ruling would have been better. Discretion is abused only when in its exercise, the trial court 'exceeds the bounds of reason, all of the circumstances before it being considered.' [Citation.] There must be a showing of a clear case of abuse and miscarriage of justice in order to warrant a reversal. [Citation.] A trial court will abuse its discretion by action that is arbitrary or ' "that transgresses the confines of the applicable principles of law." ' [Citations.] In appeals challenging discretionary trial court rulings, it is the appellant's burden to establish an abuse of discretion." (*Ibid*.)

UE Limited fails to meet this burden. UE Limited does not dispute that Patek could not offer direct evidence on the matters at issue, but rather could offer only circumstantial evidence regarding the status of the fencing and gates on the property in 2017 to support the inference that the fencing and gates were similarly maintained four years earlier. (See Evid. Code, § 600, subd. (b) ["An inference is a deduction of fact that may logically and

45

reasonably be drawn from another fact or group of facts found or otherwise established in the action."].) However, a trial court may reasonably exclude evidence it deems to be overly speculative. (See, e.g., *People v. Babbitt* (1988) 45 Cal.3d 660, 682 [trial court did not abuse its discretion in excluding evidence where " '[t]he inference which [offering party] sought to have drawn from the [proffered evidence] is clearly speculative, and evidence which produces only *speculative* inferences is *irrelevant* evidence' "].) UE Limited failed to make any showing to support an inference that the state of the gates in 2017 was indicative of how the gates were maintained several years earlier. The trial court's reasoning did not exceed the bounds of reason.

Even assuming Patek's proffered testimony would support a reasonable inference that Otay Land occasionally left a gate open during the relevant time period, such evidence would not defeat Otay Land's adverse possession claim. An adverse possessor's use of the property must be exclusive, but that exclusiveness need not be absolute. Rather, courts have consistently recognized that occasional breaches in fencing "do not destroy its continuity, unless they are permitted to remain for such a length of time as to show that the defendant did not intend to continue the exclusive appropriation." (*Jones v. Hodges* (1905) 146 Cal. 160, 164; *Andrus v. Smith* (1901) 133 Cal. 78, 80 [occasional trespass and damage to fence by "schoolboys" does not defeat evidence of exclusive possession].) Thus, Patek's testimony that he observed gates had been left open on limited occasions, even if admitted, would not be sufficient to defeat Otay Land's claim of exclusive possession. In light of the substantial evidence of Otay Land's exclusive use of the Pipeline Strip during the relevant time period, Patek's excluded testimony would have had no effect on the outcome of the trial. (See *Tudor Ranches, Inc. v. State Comp. Ins. Fund* (1998) 65 Cal.App.4th 1422, 1431-1432 ["even where evidence is

46

improperly excluded, the error is not reversible unless ' "it is reasonably probable a result more favorable to the appellant would have been reached absent the error." ' "].)

UE Limited makes another contention regarding the trial court's treatment of Patek and his testimony.  It complains that the trial court's comments during Patek's testimony "clearly indicated that [the trial court] had already made up its mind on the [exclusive use] issue although the evidence had not been completed."  The record contains no such indication. We recognize the trial court told UE Limited's counsel during its questioning of Patek that " '[w]e're . . . wasting time,' " but the context of the trial court's statement is important.  The trial court made this statement after counsel repeatedly tried to question Patek about whether gates were open in 2017 or 2018 despite the trial court consistently sustaining Otay Land's objections to such testimony.  Eventually, UE Limited entered into a stipulation with Otay Land to preserve its attempts to introduce the photographs without repeated sustained objections.  The court noted its appreciation regarding the stipulation as a means to avoid "spend[ing] two days wasting time."  The record establishes that the trial court's comments were directed toward the procedural delays associated with UE Limited's attempts to preserve its challenge to the exclusion of Patek's testimony, not an indication of bias or a refusal to consider UE Limited's evidence.

2. *Payment of Levied and Assessed Taxes on the Pipeline Strip*

UE Limited challenges the trial court's finding that Otay Land paid all taxes levied and assessed upon the property.  Under section 325, subdivision (b) of the Code of Civil Procedure, the person claiming title must have "timely paid all state, county, or municipal taxes that have been levied

47

and assessed upon the land for the period of five years during which the land has been occupied and claimed."

Here, the dispute centers on an apparent mistake by the county assessor's office regarding the assessment of taxes on the Pipeline Strip in Lot 27. The evidence at trial established that the county generally reviews deeds following a sale of real property and, if some portion of an existing parcel is not conveyed to the new owner, it will create a new assessor's parcel number (APN) for the excepted-out portion. When Otay Land purchased Lot 27 in 1998, the sale did not include the Pipeline Strip. However, the assessor's office did not create a new APN for the Pipeline Strip. It continued to treat the entirety of Lot 27 as a single parcel for assessment purposes.[29]

The evidence at trial established that Otay Land paid all of the property taxes assessed by the County of San Diego for the entirety of Lot 27, which did not differentiate between the Pipeline Strip within the parcel and the surrounding parcel. A representative from the assessor's office testified that because the Pipeline Strip was not excepted out and separately assessed, Otay Land's payment of property taxes for Lot 27 "mean[s] that you're paying taxes for all the area depicted" in the parcel map, including the Pipeline Strip. Based on this evidence, the trial court concluded that Otay Land paid all taxes levied and assessed on all the land contained in Lot 27, including the Pipeline Strip.

On appeal, UE Limited contends the trial court erred "as a matter of law" in finding that Otay Land paid the taxes levied and assessed on the Pipeline Strip, which would allow this court to apply a de novo standard of

---

[29] UE Limited offered evidence that when the assessor's office became aware of this apparent mistake after this litigation was filed, it proposed creating a new APN for the Pipeline Strip in Lot 27, but has not implemented the change due to this pending litigation.

review. Otay Land disagrees, asserting the trial court made factual findings regarding the payment of taxes that this court reviews under the substantial evidence standard of review. (See, e.g., *Finley v. Yuba County Water Dist.* (1979) 99 Cal.App.3d 691, 698 [payment of taxes for land subject to adverse possession claim is "largely a question of fact"].)

We need not resolve this dispute because we reach the same result regardless of which party is correct regarding the applicable standard of review. If Otay Land paid the taxes of the Pipeline Strip within Lot 27 due to the assessor's apparent error, as the evidence at trial demonstrated, it satisfied all elements of its claim of adverse possession. However, even if we accept UE Limited's claim that the county's alleged mistake resulted in no taxes being assessed for the Pipeline Strip due to its error in not creating a separate APN, Otay Land has still met its burden.

Although an adverse possessor must pay all taxes assessed and levied on the property at issue, the law does not require impossibilities such that if no taxes are assessed or levied, or alternatively if the government errs in some fashion in assessing and levying taxes, the party seeking to adversely possess the property has nevertheless met its burden. In *Sorenson v. Costa* (1948) 32 Cal.2d 453, 455-456, several neighbors discovered that they had been occupying lots that were shifted a half-lot to the west compared to the legal descriptions found in the relevant deeds. Similarly, the county's assessment rolls contained mistaken descriptions of the property. (*Id*. at pp. 457-458.) When one of the neighbors had the land surveyed and discovered the error, two neighbors filed cross-actions seeking to quiet title and other relief. (*Id*. at p. 456.) After the trial court found that the elements for adverse possession were satisfied, our Supreme Court affirmed. Regarding the payment of taxes, the Supreme Court explained that the

49

evidence established "that the description [of property in the assessment rolls] was mistaken and that the respondent and his predecessors actually paid all taxes assessed for the statutory period on the land that they occupied." (*Id*. at p. 465.) The Court held that "[w]here a claimant of title by adverse possession has paid the taxes actually assessed on the property occupied, a misdescription on the tax assessment roll or in the tax receipts will not generally affect the efficacy of payment under statutes requiring the payment of taxes in order to establish title by adverse possession." (*Id*. at p. 466.)

In the situation where no taxes are assessed, courts have concluded that this fact " 'would not prevent [a claimant] from acquiring title by adverse possession.' " (*Newman v. Cornelius* (1970) 3 Cal.App.3d 279, 291; see also *Cavanaugh v. Jackson* (1893) 99 Cal. 672, 675 ["There is reason in the law and impossible things are not demanded."].) In *Hagman v. Meher Mount Corporation* (2013) 215 Cal.App.4th 82, 85-86 (*Hagman*), a property owner sought to obtain, through adverse possession, title to a strip of land after he inadvertently fenced in and improved an adjoining piece of property owned by his neighbor, a nonprofit religious organization using the land for educational purposes. Given the organization's status, it qualified for a tax exemption and was not assessed any property taxes. (*Id*. at p. 86.) On appeal, the court explained that "[a] tax is assessed when the county assessor prepares the roll listing all properties subject to taxation and their assessed value" and "[a] tax is levied when the county's board of supervisors fixes the tax rate and orders that the taxes be paid 'in specific sums in terms of the rates so adopted.' " (*Id*. at p. 90.) When a property is not assessed and there is no levy of property taxes, the claimant "is accordingly not required to pay property taxes on that land under Code of Civil Procedure section 325, subdivision (b)."

50

(*Id*. at p. 91, fn. omitted; see also *Ortiz v. Pacific States Properties, Inc.* (1950) 96 Cal.App.2d 34, 39 ["An adverse claimant to real property will not be denied acquisition of title by adverse possession for nonpayment of taxes when taxes have not been both levied and assessed for one or more years during his occupancy."].)[30]

In sum, the evidence at trial established Otay Land paid all taxes levied and assessed on the APN which included Lot 27 and the Pipeline Strip. Even if we accept UE Limited's legal conclusion that Otay Land did not pay any property taxes on the Pipeline Strip within Lot 27, the undisputed evidence demonstrates that the failure to pay taxes was due to the fact that the county did not assess and levy taxes on that specific land. In this situation, the failure to pay taxes does not defeat a claim for adverse possession. Accordingly, in either scenario, Otay Land met its burden to establish it paid all taxes assessed and levied on the Pipeline Strip. (See *Allen v. Allen* (1911) 159 Cal. 197, 200 [party claiming adverse possession must establish "either that no taxes were levied and assessed upon the land, or that he had paid all taxes which were levied thereon"].)

### 3. *Unclean Hands*

Alternatively, UE Limited asserts that even if Otay Land satisfied the tax payment element, Otay Land was guilty of unclean hands because it was aware of the assessor's alleged error and took advantage of that error to satisfy its adverse possession claim. The trial court rejected this claim, finding no legal requirement for Otay Land to alert the assessor of any error.

---

[30] On appeal, UE Limited asserts that the decision in *Hagman* was premised on application of the doctrine of unclean hands. Nothing in *Hagman* suggests the court considered the unclean hands doctrine in reaching its decision.

The court also observed "that UE [Limited] could also have done something with regard to the assessment of taxes on the Strip" but failed to do so.

"Traditionally, the doctrine of unclean hands is invoked when one seeking relief in equity has violated conscience, good faith or other equitable principles in his prior conduct." (*Fibreboard Paper Products Corp. v. East Bay Union of Machinists* (1964) 227 Cal.App.2d 675, 727.) The doctrine applies as a defense against both legal and equitable claims. (*Id.* at pp. 727-728.) "Not every wrongful act constitutes unclean hands. But, the misconduct need not be a crime or an actionable tort. Any conduct that violates conscience, or good faith, or other equitable standards of conduct is sufficient cause to invoke the doctrine." (*Kendall-Jackson Winery, Ltd. v. Superior Court* (1999) 76 Cal.App.4th 970, 979.) "The doctrine of unclean hands is a defense to an equitable action, including an action to quiet title." (*Aguayo, supra*, 213 Cal.App.4th at p. 1110.)

Here, UE Limited relies on Otay Land's *inaction* as the basis for its unclean hands defense. UE Limited asserts that "Otay Land knew that the Assessor had erroneously failed to create a separate APN for the Coronado Pipe Line Strip excepted out of the sale of Lot 27 . . . [and] [d]espite that knowledge, Otay Land failed to inform the Assessor of the error but sought to take advantage of it." Under general principles of tort law, the failure to take affirmative action, absent a special relationship creating a duty to act, is treated differently than actual misconduct. (See, e.g., *Williams v. State of California* (1983) 34 Cal.3d 18, 23-24.) UE Limited has not cited any authority establishing Otay Land had an affirmative duty to correct a purported error by the assessor's office that the claimant did not cause. (Cf. *Aguayo, supra*, 213 Cal.App.4th at p. 1112 [where "a party claiming adverse possession engages in deceitful interference with the true owner's ability to

52

defeat the claim, the trial court may in its discretion apply the defense of unclean hands"].)

Even assuming such a duty exists, the record does not establish Otay Land breached this duty where it was not aware of the tax issue until after it filed this lawsuit. At trial, Otay Land's director of operations, responsible for the entitlement process for the parcels at issue, testified that Otay Land learned of the Pipeline Strip, and its attendant ownership issues, for the first time in 2013. That same year, Otay Land began researching the ownership of the Pipeline Strip. It was not until 2016 that Otay Land reached the conclusion that UE Limited owned the Pipeline Strip. A consultant for Otay Land reinforced this timeline when she testified that she discovered the separate ownership of the Pipeline Strip by UE Limited in 2016. That consultant, however, also testified that she did not research any tax issues related to Lot 27. Instead, Otay Land discovered the issue itself sometime well after the lawsuit was filed when it reviewed the assessor's parcel map.

As discussed *ante*, Otay Land focused at trial on establishing each element of its adverse possession claim during the five years preceding the filing of the lawsuit, from 2007 to 2013. The record contains no indication that Otay Land was aware of the apparent assessment mistake either before or during that time period. Without knowledge of the alleged mistake, Otay Land could not have reported the mistake to the assessor. Since any duty to report the alleged mistake could not have arisen during the relevant time period, Otay Land could not be found to have breached its duty even assuming one exists. Accordingly, UE Limited failed to establish its defense of unclean hands.

UE Limited also claims that Otay Land was guilty of unclean hands because its adverse possession claim and, by extension, the trial court's

53

judgment "effectively divided the [Pipeline Strip] into multiple additional parcels without [Subdivision Map Act] approval, and then merged them into Otay Land's residential subdivision." As discussed *ante*, an alleged violation of the Subdivision Map Act does not automatically void a transfer of property that creates multiple parcels. Nevertheless, UE Limited implies that Otay Land violated the Subdivision Map Act by not providing notice of the proposed subdivision to the adjacent property owners, which allowed Otay Land to proceed with its attempt to adversely possess the Pipeline Strip "by stealth."

UE Limited fails to demonstrate that a claimant seeking to adversely possess a portion of a property, which may effectively result in a split of a parcel, must comply with the Subdivision Map Act before filing a complaint. Regardless, even assuming the Subdivision Map Act applied to the filing of an adverse possession claim, UE Limited's contentions center on whether Otay Land's alleged noncompliance resulted in insufficient notice to UE Limited of Otay Land's intent to adversely possess the Pipeline Strip, thereby violating UE Limited's due process rights. The trial court, however, necessarily found that Otay Land met its burden to establish each element of its adverse possession claim by demonstrating that its actual possession of the Pipeline Strip provided reasonable notice to UE Limited. (See, e.g., *Nielsen*, *supra*, 178 Cal.App.4th at pp. 326-328 [claimant must establish open and notorious occupation of property sufficient to provide notice to actual owner].) It is this open and notorious possession that provides notice to an actual owner and nothing requires a claimant seeking to adversely possess property to provide *actual* notice of its occupation. (*Ibid*.) "As one California Court of Appeal colorfully wrote, an adverse user ' " 'must unfurl his flag on the land, and keep it flying, so that the owner may see, *if he will*, that an

54

enemy has invaded his domains, and planted the standard of conquest.' " ' "
(*Id*. at p. 327.) UE Limited does not challenge the sufficiency of the evidence
to support the trial court's finding on this element of adverse possession.
Accordingly, any purported failure to provide actual notice pursuant to the
Subdivision Map Act does not defeat Otay Land's claim.

In sum, the evidence establishes that Otay Land satisfied every
element of its claim of adverse possession and UE Limited failed to meet its
burden of establishing its defense of unclean hands. The trial court therefore
correctly found in favor of Otay Land on its claims related to Lot 27 and
entered judgment in its favor.

## DISPOSITION

The judgment is affirmed. Otay Land is entitled to its costs on appeal.

GUERRERO, J.

WE CONCUR:

O'ROURKE, Acting P. J.

DO, J.

55